ESPASAS DAIRY, INC., COMPAÑÍA PASTEURIZADORA, INC., ETC., recurrentes; BUENA VISTA DAIRY, INC., ETC., recurrentes, *v.* JUNTA DE SALARIO MÍNIMO DE PUERTO RICO, recurrida.

*Números:* JSM-65-1, JSM-65-2      *Resueltos:* 14 de enero de 1969

*Enrique Córdova Díaz, Francisco Torres Aguiar, Sarah Torres Peralta* y *Gustavo A. Del Toro Bermúdez,* abogados de los recurrentes; *Ismael Soldevila* y *Rafael Cabello Ortiz,* abogados de la recurrida.

EN MOCIÓN DE RECONSIDERACIÓN

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

Se trata de la reconsideración de la sentencia dictada por este Tribunal, 94 D.P.R. 816 (res. el 20 de junio de 1967), sobre la validez de las disposiciones del Decreto Mandatorio Núm. 27 de la Industria de la Leche y de la Ganadería promulgado por la Junta de Salario Mínimo el 24 de abril de 1965, que se refieren a la fijación de salarios a los chóferes-vendedores y los ayudantes-vendedores. (¹)

█ Los recurrentes han señalado en reconsideración diez errores que pueden, en aras de la brevedad y sin sacrificar la verdad, resumirse en uno: el haber concluido que la Junta de Salario Mínimo tiene facultad para fijar salarios mínimos por horas a los chóferes-vendedores y ayudantes de la industria lechera, no empece las disposiciones de la Ley Núm. 114 de 30 de junio de 1965. 5 L.P.R.A. sec. 1120 (Supl. 1967, pág. 124).

Admitimos desde el principio que el texto poco feliz de esta ley es susceptible de más de una interpretación. Nuestra función indeclinable es la de poner en vigor sus disposiciones cumpliendo cabalmente con los propósitos que tuvo en mente el legislador al aprobarla. Esto nos lleva a considerar la naturaleza del problema envuelto y a determinar los motivos o razones que dieron base a la aprobación de la ley.

La industria de la leche es de vital importancia para nuestra economía. El Gobierno ha promovido su desarrollo y crecimiento mediante cuantiosas asignaciones de fondos públicos para programas de mejoramiento de pastos, erradicación de enfermedades del ganado, inseminación artificial, incentivos para la construcción de facilidades en la ganadería y otros. (²) En la década de 1954 al 1964 la produc-

---

(¹) Los hechos que dieron base a este recurso aparecen expuestos en la opinión del 20 de junio de 1967, por lo cual no es necesario volverlos a repetir aquí.

(²) Sin contar lo asignado a otros programas, en el de mejoramiento de pastos nada más, hasta 1963, se habían pagado incentivos a los agricultores por más de $6,000,000. Véase el estudio preparado en diciembre de 1964 por la División de Economía de la Junta de Salario Mínimo.

ción de leche aumentó a más de $56,000,000, lo que representó el veinte por ciento del valor total de la producción agrícola de Puerto Rico.[3] La interpretación que demos a la Ley Núm. 114 no debe en forma alguna afectar la estabilidad de este importante sector de la economía, de cuyo bienestar participan tanto trabajadores como patronos.

La práctica de la industria lechera durante los últimos años ha sido la de compensar a los chóferes-vendedores y sus ayudantes a base de comisión por litros de leche vendidos. Esta práctica ha tenido el endoso favorable tanto de los patronos como de los trabajadores,[4] por una razón muy contundente: tanto los chóferes como los patronos tienen así mayores beneficios. El pago a base de comisión estimula el esfuerzo de los chóferes-vendedores a aumentar las ventas, en beneficio no sólo de ellos mismos y sus patronos, sino también de la economía en general.[5]

No obstante, el comité que investigó la industria recomendó la fijación de un salario mínimo por unidad o por hora, lo que resultare mayor. El comité recomendó la fijación de compensación en esa forma para proteger a los patronos contra reclamaciones de horas extras computadas a base del doble de la comisión recibida, que es la fórmula adoptada por el Departamento del Trabajo. La fórmula consiste en sumar todas las horas trabajadas y dividirlas por la comi-

---

[3] Id.

[4] Véase Exposición de Motivos de la Ley Núm. 114 de 30 de junio de 1965, *Leyes de Puerto Rico, 1965, Primera Sesión Ordinaria*, pág. 337.

[5] La conclusión de que los trabajadores ganan más la refleja el propio estudio de la División de Economía de la Junta de Salario Mínimo. En la pág. 38 de dicho estudio se expresa: "El mayor número de empleados (633) se registró en la ocupación de chófer vendedor. Estos trabajadores recibieron un jornal promedio por hora regular sin incluir incentivo de 90.5 centavos. En esta ocupación fue donde más alto resultaron los pagos de incentivo. El incentivo recibido por estos trabajadores elevó el jornal promedio por hora regular a 136.8 centavos."

Pero no sólo ganan más sino que trabajan menos. Véase la Tabla 7 de la declaración del economista Luis A. Nazario: Exh. P. 5.

sión total recibida para así obtener la compensación por horas. Las horas extras se computan, entonces, al doble. (⁶) Sin embargo, ante la duda de la eficacia de ese remedio el comité recomendó a la Junta que se tramitara legislación ante la Asamblea Legislativa para excluir a los chóferes-vendedores y sus ayudantes de la Ley de Salario Mínimo. En esta forma se disolvía el "estado de incertidumbre en la industria de la leche y de la ganadería ante la posibilidad de reclamaciones futuras por conceptos de horas extraordinarias y amenaza de estabilidad de la propia industria . . .", según reza la Exposición de Motivos. (⁷) Tal exclusión está plenamente sostenida por hechos incontrovertibles que se aceptan en la propia opinión de la mayoría. Citamos de la Exposición de Motivos:

"Estos vendedores y ayudantes de vendedores realizan sus labores sin supervisión directa, sin que el patrono pueda gobernar o constatar las horas que efectivamente trabajan; son ellos los que venden el producto, proveen el servicio y la atención, y toman la acción que a su juicio deben tomar para mantener y aumentar su clientela, siendo los únicos que verdaderamente conocen dicha clientela; prestan sus servicios fuera de las plantas de leche; regresan a las plantas de leche a los solos fines de entregar la propiedad y cuadrar las cuentas de la leche y otros productos lácteos vendidos, siendo, como cuestión de hecho, verdaderos vendedores ambulantes."

---

(⁶) Véase testimonio del Sr. Pedro Juan Dumont, Director del Negociado de Normas del Trabajo ante el Comité. R.T., pág. 107.

(⁷) Véase además el Voto Explicativo del Presidente del Comité Lcdo. Carlos Rivera Hernández expresando:

"Existe conflicto de opinión legal respecto a si decretándose ahora el pago por comisión, los patronos estarían siempre expuestos a futuras reclamaciones judiciales por horas extras o extraordinarias de chóferes-vendedores y vendedores ayudantes."

.     .     .     .     .     .     .     .

"En otras palabras los representantes del interés obrero pretenden que cuando se les compense por comisión, se les pague las horas extras a base de la comisión recibida. Esto me parece absurdo. Aun cuando es concebible que se pague así, sería claramente ilegal la actuación del Comité al fijar salarios superiores a $1.25 la hora."

La mera exclusión de estos trabajadores de la jornada máxima de labor establecida por la Ley Núm. 379 de 1948, sin excluirlos de la fijación de salario mínimo por hora, como interpreta la opinión del Tribunal de 20 de junio de 1967, no resuelve el serio problema de incertidumbre que amenaza el crecimiento y expansión de esta industria. [8] En primer término, porque si bien quedan excluidos de la Ley 379—si es que no lo estaban bajo el Art. 19 de la Ley 379, 29 L.P.R.A. sec. 288, *A. D. Miranda, Inc.* v. *Falcón*, 83 D.P.R. 735 (1961)—mientras se les fije compensación a base de salarios mínimos por hora siempre quedarían cubiertos por la Sec. 16, Art. II de nuestra Constitución, [9] que garantiza el pago de una compensación extra de por lo menos una vez y media del tipo de salario ordinario por las horas extras realizadas en exceso de ocho horas. Así se ve obligada a reconocerlo la propia opinión mayoritaria. En segundo término, porque al fijar salarios por hora, impone la obligación a los patronos de establecer un—sino imposible, costosísimo—sistema de supervisión, y control que da al traste con el propósito primordial de la Ley Núm. 114 de coadyuvar al crecimiento y expansión de esta industria. Como muy bien señala la opinión disidente la posición asumida por la mayoría *"frustra a todas luces uno de los anunciados propósitos legislativos al aprobar la Ley Núm. 114,* a saber,

_____

[8] Véase testimonio del Sr. Rafael Nevárez Guillermety, R.T., pág. 221.

[9] "Se reconoce el derecho de todo trabajador . . . a una jornada ordinaria que no exceda de ocho horas de trabajo. Sólo podrá trabajarse en exceso de este límite diario, mediante compensación extraordinaria que nunca será menor de una vez y media el tipo de salario ordinario, según se disponga por ley."

No debe interpretarse que esta disposición constitucional cubre a todos los llamados "vendedores ambulantes". Ratificamos lo resuelto en *A. D. Miranda Inc.* v. *Falcón*, supra, al efecto de que el trabajador a quien se le garantiza constitucionalmente el pago por labor extraordinaria es "aquel grueso de la clase trabajadora que por razón de especial desvalimiento históricamente ha necesitado . . . protección social."

*que estos empleados no estuvieran sujetos a las leyes sobre horas máximas de labor."*

El sistema de comisión cubre a más de 90% de los trabajadores de esta industria. Fue adoptado hace más de una década.[10] Su mayor virtud es que obvia las dificultades de supervisión inherentes a la naturaleza del trabajo de los vendedores, sin lesionar sus ingresos. Muy por el contrario, aumentándolos.[11]

En realidad el sistema de salarios mínimos por *hora* es esencialmente incompatible con la naturaleza del trabajo de estos vendedores que ". . . realizan sus labores sin supervisión directa, sin que el patrono pueda gobernar o constatar las horas que efectivamente trabajan . . . ." Es precisamente la ausencia de supervisión y la dificultad en la constatación del número de horas extras trabajadas por estos chóferes-vendedores lo que requiere que se les excluya no sólo de las disposiciones de la ley relativas a la jornada máxima de labor, sino también de la fijación de salarios mínimos por *hora*, pues en fin de cuentas, es la *hora* la unidad de trabajo que sería necesario supervisar y constatar. Deslindar—como pretendió la mayoría—la jornada máxima de labor y la fijación de salarios mínimos, convierte en vano e inútil el esfuerzo legislativo.

En resumen, la interpretación adoptada por la mayoría del Tribunal en la opinión de 20 de junio de 1967, 94 D.P.R. 816, limitando la Ley Núm. 114 exclusivamente a eximir de la jornada máxima de labor a los chóferes-vendedores y sus ayudantes de la Industria de la Leche y de la Ganadería, derrota penosamente el esfuerzo de propiciar el crecimiento y expansión de esta industria de cuyo bienestar, repetimos, participan tanto trabajadores como patronos.

■ Nuestra función judicial es darle eficacia a la intención legislativa interpretando siempre la ley en forma que

---

[10] Véase testimonio del Dr. Isidoro Colón, R.T., pág. 383.

[11] Véase escolio 5.

responda adecuadamente al fin que ella se propone, coadyuvando a lograr su propósito. Expuesto el problema de esta industria, como lo hemos hecho anteriormente, debemos concluir que el propósito enmarcado en la Ley Núm. 114 fue no sólo excluir a los chóferes-vendedores de la Ley Núm. 379 de 1948, *sino también limitar la facultad de la Junta de Salario Mínimo a fijar compensación exclusivamente a base de comisiones mínimas.* En esta forma se logra la política pública de disolver el estado de incertidumbre de esta industria creado por aplicación de salarios mínimos y las disposiciones de la jornada máxima de trabajo.

Esta interpretación que le damos a la Ley Núm. 114 fue la misma que le dio el Presidente de la Junta de Salario Mínimo cuando se opuso ante el Secretario del Trabajo— quien también la objetó—a su aprobación. [12]

En aquel momento el Presidente de la Junta entendió tan claramente el propósito de la legislación que, por no estar de acuerdo, se opuso a ella. Ahora, yéndose sobre el Gobernador y la Legislatura, a quienes en nuestro sistema de gobierno corresponde determinar la política pública, se hace caso omiso de ésta y se pretende dejarla sin efecto. No estamos de acuerdo.

■ *Se dejará sin efecto la sentencia dictada en 20 de junio de 1967, y se dictará una nueva sentencia decretando la nulidad del Art. II del Decreto Mandatorio Núm. 27 en sus apartados 2 y 3 en cuanto fijan salario mínimo por hora a los chóferes-vendedores y ayudantes vendedores.*

El Juez Asociado Señor Santana Becerra disintió en opinión separada en la cual concurren el Juez Presidente

---

[12] El Presidente de la Junta Sr. Carlos A. Vilá Tous, en su memorando de 25 de mayo de 1965 al Hon. Secretario del Trabajo expresó su oposición al proyecto porque:

"El proyecto, a mi juicio, dejaría sin efecto también el salario mínimo por hora vigente en lo que se refiere a estos empleados."

Señor Negrón Fernández y los Jueces Asociados Señores Hernández Matos y Dávila.

—O—

Opinión disidente, en reconsideración, del Juez Asociado Señor Santana Becerra, en la cual concurren el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Hernández Matos y Dávila

San Juan, Puerto Rico, a 14 enero de 1969

En 20 de junio de 1967, a nombre de una mayoría de cinco Jueces del Tribunal, emití opinión sosteniendo la validez del Decreto Mandatorio Núm. 27 aplicable a la Industria de la Leche y de la Ganadería, Tercera Revisión (1965).

En 10 y 14 de julio de 1967 las empresas recurrentes radicaron mociones de reconsideración. En 21 de julio de 1967 la Junta de Salario Mínimo hizo oposición a la reconsideración solicitada y pidió vista oral. En 8 de enero de 1968, sin que aún se hubiera resuelto la moción de reconsideración, el Juez Asociado Señor Emilio S. Belaval, quien había formado parte de la mayoría, cesó en su cargo. Con la intervención ahora del Juez Asociado Señor Torres Rigual nombrado en la vacante creada, se resuelve el caso en reconsideración, se deja sin efecto la sentencia original de mayoría de 20 de junio de 1967 y se decreta la nulidad del Decreto Mandatorio Núm. 27 en sus apartados 2 y 3 en cuanto fijan salario mínimo por hora a los choferes vendedores y ayudantes vendedores.

A mi juicio, la opinión en reconsideración adolece del error, que arrastra de la expresión minoritaria al resolverse el caso originalmente, de confundir y mixtificar dos conceptos enteramente distintos en la esfera del trabajo, cuales son: (1) el concepto del salario mínimo con (2) el concepto de la jornada mínima, normas y condiciones de trabajo. Adolece

también del error, a mi juicio, como en la expresión minoritaria anterior, de atribuirle a la Ley Núm. 114 de 30 de junio de 1965 una motivación que no tuvo y unos alcances que no tiene.

La facultad legal de la Junta de Salario Mínimo creada por la Ley Núm. 96 de 26 de junio de 1956, para fijar un salario mínimo en forma alternativa como lo fijó en el Decreto Mandatorio impugnado para los choferes distribuidores, está claramente reconocida por la Sec. 16 de dicha Ley, según esta sección fue enmendada por la Ley Núm. 105 de 26 de junio de 1964. Dispone expresamente esta sección que en ciertas situaciones que menciona, *"así como en cualquier otra actividad económica,* los comités podrán recomendar y la Junta fijar salarios mínimos por unidades de trabajo *en vez de tipos de salario por hora o alternativamente,* cuando así lo creyeren aconsejable por la naturaleza de las labores a realizarse."* Con esta disposición el Legislador permitió a los Comités y a la Junta separarse de la unidad básica de retribución mínima de la Ley que es *la hora,* y les autorizó a usar otra unidad, o *alternativamente.*

Así lo creyó aconsejable el Comité que adoptó el Decreto Mandatorio Núm. 27 y la Junta que lo aprobó, considerando que se protegía mejor al obrero fijando el salario mínimo en la alternativa de por unidad o de por hora, a la luz de ciertas particularidades típicas del reparto de leche.

Procede tener fijo en mente, ya que se invoca la Ley Núm. 114 de 1965 para anular el Decreto, que la Junta de Salario Mínimo creada por la Ley Núm. 96 de 1956 nada tiene que ver con *condiciones y normas de trabajo.* Ejerce su función sola y únicamente con el salario mínimo. Lo que hubiere respecto a normas de trabajo en decretos mandatorios aprobados por la actual Junta de Salario Mínimo son expresiones adicionales, vigentes bajo la anterior legislación de 1941, que por mandato expreso de la Sec. 40(b) de la

Ley de 1956 deben quedar vigentes en todo lo que no sea salario mínimo. (¹)

El Decreto Mandatorio Núm. 27 que se impugna fue adoptado por el Comité que investigó la Industria de la Leche y la Ganadería en 5 de marzo de 1965. En 2 y 5 de abril de 1965 las recurrentes objetaron ante la Junta la aprobación de dicho proyecto de Decreto. Su posición original fue al efecto de que los choferes que repartían leche no deberían considerarse incluidos en la Ley Núm. 379 de 1948, bajo la disposición de dicha Ley que excluye a los agentes vendedores de jornadas máximas y otras normas. Estas objeciones—que no se referían al salario mínimo—no prosperaron y en 24 de abril de 1965 la Junta de Salario Mínimo publicó la aprobación del Decreto 27.

En 3 y 4 de mayo de 1965 las peticionarias solicitaron reconsideración de la aprobación del Decreto, conforme a lo dispuesto por ley, Sec. 29(d), Ley Núm. 96 de 1956. En esta etapa en que estaba pendiente de resolverse tal reconsideración, las recurrentes hicieron saber a la Junta de la presentación, en 10 de marzo de 1965, del Proyecto de la Cámara Núm. 135 que excluía a los choferes vendedores y sus ayudantes en la Industria de la Leche de la aplicación de las leyes y decretos sobre *horas máximas de trabajo*. El Proyecto 135 se convirtió en la Ley Núm. 114 de 30 de junio de 1965. Las recurrentes solicitaron entonces de la Junta que devolviera el Decreto al Comité para que actuara a la luz de dicha legislación. A ello se negó la Junta y quedó definitivamente aprobado el Decreto Mandatorio Núm. 27. Las recurrentes impugnaron el Decreto en estos recursos.

En la opinión original del Tribunal se hace una exposición sobre la referida Ley Núm. 114. En vista de las motivaciones y de los alcances que a dicho estatuto se le da en la

(¹) En el futuro, véase la Ley Núm. 116 de 21 de junio de 1968: vacaciones y licencia por enfermedad.

opinión en reconsideración, creo necesario el ampliar el historial de dicha Ley.

(1) El P. de la C. 135 fue presentado por el Representante Sr. Milán Padró en 10 de marzo de 1965 y se titulaba originalmente: "Para decretar la no aplicabilidad de las leyes y decretos sobre *horas máximas de trabajo* a los vendedores y sus ayudantes de leche fresca y otros productos lácteos y autorizar a los Comités de la Industria Lechera a recomendar y a la Junta de Salario Mínimo aprobar comisiones mínimas para dichos empleados". (Énfasis nuestro.) *Diario de Sesiones*, Vol. 19, Tomo 2, pág. 398.

(2) Tal como fue originalmente presentado, el Proyecto consistía de una Exposición de Motivos y de dos artículos de fondo. El Art. 1 disponía que las leyes y decretos estableciendo el *máximo de horas* que puedan ser trabajadas por cualquier empleado, o que en forma alguna reglamenten las *horas de trabajo* de los empleados, no serían aplicables a los vendedores y sus ayudantes de leche fresca y otros productos lácteos. El Art. 2 disponía que los Comités de Salario Mínimo podrían recomendar y la Junta de Salario Mínimo aprobar comisiones mínimas a ser pagadas a los vendedores y sus ayudantes de leche fresca y otros productos lácteos.

(3) En cuanto a la razón de ser del Proyecto, la Exposición de Motivos decía que existía alguna duda sobre si los vendedores y distribuidores de leche fresca y productos lácteos estaban cubiertos o no por la exención de *viajantes* que tradicionalmente han establecido las leyes en relación con *horas extras*. (Se está refiriendo al pago de *horas extras* y a la jornada de trabajo de la Ley Núm. 379 de 1948.) Que era deseable, para no detener el continuo crecimiento y expansión de la industria lechera *el que se aclarara en forma definitiva* cualquier duda que pudiera existir sobre la aplicabilidad de las leyes y decretos sobre *horas extras* a estos vendedores y ayudantes. Se expresaba también que el sistema de pago por comisión a dichos vendedores y ayu-

dantes había demostrado ser uno justo y razonable y que estos obreros podrían ser protegidos por la Junta de Salario Mínimo mediante la fijación de comisiones mínimas a base de las recomendaciones de los Comités designados. *Diario de Sesiones*, Vol. 19, Parte 4, pág. 1666.

(4) Como fundamento de la duda, decía también la Exposición de Motivos que las empresas no tenían control directo ni la necesaria supervisión del trabajo de los distribuidores a los efectos de las *horas extras.*

(5) Informado el Proyecto por la Comisión de Trabajo, la Exposición de Motivos original quedó redactada como aparece en la Ley Núm. 114, conservando las motivaciones del Proyecto ya expuestas.

(6) Se enmendó el Proyecto para incluirle la materia contenida en el Art. 3 de la Ley aprobada. Nada hubo en la discusión del Proyecto en el hemiciclo que alterara el motivo original de su presentación, que como se ha dicho, fue dejar claro, para eliminar dudas, que a estos choferes distribuidores de leche no se les aplicarían las disposiciones de ley vigentes relativas a *jornada máxima de trabajo y horas extras.*

(7) Por otra parte, para no dejarlos indefensos en cuanto a vacaciones, día de descanso, licencia por enfermedad y otras *condiciones de trabajo garantizadas a otros obreros de la Industria* que no fuera la *jornada máxima de labor y horas extras*, se incluyó el Art. 3 que originalmente no estaba en el Proyecto. *Diario de Sesiones*, Vol. 19, Parte 4, págs. 1666, 1678–1686.(²)

Nada en la Ley Núm. 114 milita en contra de la acción del Comité y de la Junta. La ley disipó las dudas y los

---

(²) Hubo una amplia discusión en el hemiciclo motivada por cierta enmienda de la Comisión de Trabajo que establecía diferencia entre obreros unionados en la Industria Lechera y los no unionados. La enmienda fue derrotada. *Diario de Sesiones*, id.

temores de las empresas lecheras y procedió a excluir a los choferes distribuidores de las garantías de otra legislación en cuanto a *jornada máxima de labor* y el pago de *horas extras*, de igual modo que la Ley Núm. 379 de 1948 había excluido de estas disposiciones a los agentes viajeros. La razón en ambos casos: la misma—la dificultad de la empresa de tener el necesario control y supervisión de la labor, dada la naturaleza del trabajo, sobre tales jornadas máximas y horas extras.

La Ley Núm. 114 no privó al Comité ni a la Junta de su facultad expresamente concedida de fijar un salario mínimo en forma alternativa. Conocedores el Comité y la Junta por la evidencia ante ellos que podrían surgir situaciones en que una retribución fijada únicamente a base de comisión podría ser destructiva del derecho del obrero a una retribución mínima, ésta fue una de esas situaciones en que de acuerdo con la expresión legislativa en la Ley Núm. 96 creyó aconsejable o deseable el fijar el salario en forma alternativa. Factores ajenos al empleado, como la rotura de los vehículos, entorpecimientos inesperados podrían privar al obrero de una retribución, no obstante estar trabajando, a base únicamente de la unidad. El Decreto sólo asegura una retribución mínima, independientemente de cualquier contingencia de la cual el obrero no es culpable.

Con esta determinación del Comité y de la Junta no nos es lícito intervenir sin violentar el precepto de ley que regula la revisión judicial de los Decretos Mandatorios. Por otra parte, el Decreto impugnado no ignora el estatuto 114, ya que fija salarios mínimos a estos obreros por comisión o unidad.

Dispone la Ley Núm. 96 en su Sec. 1 que es la política de la Asamblea Legislativa que los procedimientos que autoriza dicha Ley para *la fijación* y para *la revisión* de salarios mínimos sean conducidos en forma cuasi-legislativa. Aun

cuando no se expresara, un Decreto Mandatorio es una pieza legislativa, una reglamentación de ley positiva que surge de la evaluación de una situación de hecho que ha estado ante la consideración del Comité.

Para hacer efectiva esa política pública expresada, la propia Asamblea Legislativa delineó cuidadosamente el ámbito de la revisión judicial de un Decreto, y determinó: (Art. 29)

1. Las conclusiones de hecho de un Comité de Salario Mínimo, actuando dentro de sus poderes, *serán concluyentes,* en ausencia de fraude.

Debe ser concluyente para el Tribunal la conclusión del Comité de la existencia de una situación de hecho que hacía aconsejable, bajo la Sec. 16 de la Ley 96, enmendada por la 105 de 1964, la fijación de un salario en la alternativa.

2. El Tribunal puede confirmar, anular o devolver un Decreto, pero la *anulación* o *devolución* de un Decreto se hará sólo:

(a) porque el Comité actuara sin facultad o en exceso de sus poderes, si esta cuestión se hubiere levantado expresamente ante el Comité y luego ante la Junta, o ante ésta;

(b) porque la Junta actuara en exceso de su facultad o de sus poderes, si la cuestión se hubiere levantado expresamente ante la Junta;

(c) porque el Decreto se obtuvo mediante fraude.

Nada de lo anteriormente expuesto que autoriza a este Tribunal a *anular* un Decreto ocurrió en el caso ante nos. Después de aprobado el Decreto Mandatorio Núm. 27 impugnado se aprobó la Ley Núm. 114. La Junta entendió que no debía devolver el Decreto al Comité por considerar que el Decreto y la Ley Núm. 114 aprobada después no eran incompatibles. Estuvo correcta en su criterio ya que no lo son, y la Ley Núm. 114 no se refería a salario mínimo y sí a *jornada mínima* y condiciones de trabajo. En momento alguno la Ley Núm. 114 despojó al Comité y a la Junta de

la facultad de fijar un salario en la alternativa, expresamente concedídale por la Ley 96.

Pero aun cuando fuera discutible y admitiera criterio en contrario la determinación de la Junta al negarse a devolver el Decreto, en ausencia de ilegalidad plena, al Tribunal le debe merecer gran peso esa determinación bajo bien conocidas normas de la revisión judicial de los actos administrativos y cuasi-legislativos; y en deferencia al organismo administrativo designado por ley como el especialmente capacitado para hacer tales determinaciones de salario mínimo; y en cumplimiento de la política pública legislativa que expresamente fijó los límites de este Tribunal en la revisión judicial de un Decreto.

Contrario a lo expuesto, la mayoría de ahora sustituye el criterio y la interpretación administrativa de la Ley Núm. 114 hecha por la Junta por el criterio y la interpretación sugerida por las empresas, que el Tribunal adopta, sin que aparentemente existan razones de peso que obliguen a ello excepto una diferencia de criterio sobre el alcance de un estatuto. Siendo el Decreto una pieza legislativa, de haber dos interpretaciones de la Ley Núm. 114, una que anularía el Decreto y otra que lo armoniza, creo nuestro deber optar por la segunda, como lo hizo la Junta.

Al estructurarse el Comité de Salario Mínimo se creó un organismo inteligente y democrático por excelencia. Tres de sus miembros defienden el interés patronal, tres el interés obrero y tres representan el interés público y sirven de agente estabilizador entre las otras dos partes. El producto del Comité, que es el Decreto, fundamentalmente es balanceado, justo, razonable y equitativo para todos los intereses envueltos. De ahí que la Legislatura dispusiera que las determinaciones *de hecho* del Comité, en ausencia de fraude, sean intocables, aun por la Junta. Un tribunal no estaría mejor capacitado que el Comité en cuanto al peso de las conclu-

siones de hecho de éste, pero aun cuando lo estuviera, fue mandato legislativo el que no las alterara. [3]

Finalmente, ante el problema aquí envuelto, el hecho de la situación económica de la empresa lechera al cual se le da pronunciado énfasis en la opinión en reconsideración, es insustancial.

El propósito de la Ley Núm. 114, que surge de su faz, no fue afrontar ni remediar la situación comercial de las empresas lecheras. Para afrontar este problema, la Legislatura ha venido aprobando una serie de leyes y medidas apropiadas. *Véase:* la relación de estas leyes y medidas de ayuda en mi opinión del Tribunal en *Industria Lechera* v. *Srio. de Hacienda*, 95 D.P.R. 839 (1968). El hecho de que el Decreto Mandatorio Núm. 27, Tercera Revisión de 1965, haya estado en toda su fuerza y vigor no ha causado el derrumbe de las empresas lecheras, a juzgar por el hecho de que el Decreto Mandatorio Núm. 27, Cuarta Revisión de 1968 se adoptó por el Comité en igual forma alternativa de fijación de salario mínimo a estos empleados. Como cuestión de realidad, no toda la Industria funcionó siempre a base de unidad de venta.

Por lo anteriormente expuesto, disiento de la anulación que ahora en reconsideración se hace del Decreto Mandatorio Núm. 27, Tercera Revisión, 1965.

---

[3] En un voto suyo en el caso de *Pueblo* v. *Santos Cormier*, resuelto en 2 de abril de 1969, expresó el Juez Sr. Rigau que "este Tribunal debe ejercer su poder para revocar en los hechos con un gran sentido de autodisciplina." En las circunstancias en que por ley le es permisible a este Tribunal ejercer la revisión de un Decreto, ese llamado a la autodisciplina cobra expresión máxima.